STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
CASE TYPE:  EMPLOYMENT

KEITH A. GUGGENBERGER, an
individual,

      Plaintiff,

v.

STARKEY LABORATORIES, INC., a
Minnesota corporation,

      Defendant.

Court File No.:27-CV-15-17093

**AMENDED COMPLAINT FOR
BREACH OF CONTRACT, BREACH
OF IMPLIED COVENANT OF GOOD
FAITH AND FAIR DEALING,
DEFAMATION, UNPAID WAGES,
UNJUST ENRICHMENT, AND
RELIEF UNDER 29 U.S.C.
§ 1132(a)(1)(B)**

**REQUEST FOR JURY TRIAL**

      Plaintiff Keith A. Guggenberger, for his Amended Complaint against Defendant Starkey

Laboratories, Inc. ("Starkey") in the above captioned matter, alleges as follows:

## PARTIES

      1.    Defendant Starkey Laboratories, Inc. (referred to as "Starkey" herein) is a

Minnesota corporation doing business under the name of Starkey Hearing Technologies.  Its

headquarters are located in Eden Prairie in Hennepin County, Minnesota.  William F. Austin

purchased Starkey in 1970 and merged it with his hearing aid service.  Starkey has become a

world leader in innovative hearing aid technology and one of the six largest hearing aid

manufacturers in the world, with annual revenues of approximately $800 million.  Starkey now

has approximately 3,600 employees, of whom approximately 1,900 are shareholders in Starkey

through Starkey's employee stock ownership plan ("ESOP").  Austin is the sole director of

Starkey as well as its CEO and majority shareholder.  He resisted the establishment of Starkey's

ESOP and detests any limitation on his authority and power in the company.

2.      Plaintiff Keith A. Guggenberger is an individual residing in Hennepin County, Minnesota.  Until September 9, 2015, Guggenberger was Starkey's Senior Vice-President of Operations, with executive responsibility for Starkey's Global Manufacturing, Supply Chain, Quality, Process, Test & Integration Engineering functions, and Information Technology.  Over his 29-year career at Starkey, Guggenberger applied his expertise in process engineering to standardizing Starkey's training of assembly personnel; transitioning product assembly out of a piecework system and into factories; shortening custom manufacturing lead times from three weeks to three days; developing the entire quality management system, including ISO 9001 certification; overhauling Starkey's IT organization; establishing Starkey's global 3D printing capabilities; expanding Starkey's manufacturing into China and Mexico to create significantly better gross margin performance; consolidating Starkey's operations in Europe; and leading many corporate strategies and tactics throughout the company.  Guggenberger held successive posts as Process Engineer, Process Engineering Manager, Director of Quality, Vice-President of Information Technology, and finally Senior Vice-President of Operations.  In that role, Guggenberger had 55 departments and over 1,500 employees under him, and was in charge of a substantial budget.  At the time of his termination, he was employed pursuant to an Employment Contract dated December 1, 2014 (a copy of which is attached as Exhibit 1).  He is a participant in the Starkey ESOP.  His fully vested account balance in the ESOP as of December 31, 2014 was $183,944.85.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over Starkey, which is a Minnesota corporation with its headquarters located in Minnesota.  Venue is proper under Minn. Stat. § 542.09 because Starkey is located in Hennepin County and because Guggenberger's causes of

2

Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

action or parts of his causes of actions arose in Hennepin County.  The Court has jurisdiction to enforce Guggenberger's rights in the Starkey ESOP under 29 U.S.C. § 1132(e).

## FACTUAL BACKGROUND

### A.    *Termination Day.*

4.    On Tuesday morning, September 8, 2015, Rob Duchscher, Starkey's Vice-President of Information Technology (who reported to Guggenberger), advised the Executive Leadership Team via email that their computers would be picked up around 1 p.m. that day to install malware prevention software.  That excuse was apparently consistent with Starkey's ongoing response to a serious malware infection that had occurred in late May.  Guggenberger and other executives therefore took Duchscher's advisement at face value.  It later turned out to be a ruse engineered by Brandon Sawalich and Richard Brown to sequester the computers of officers marked down for termination.  Sawalich was Starkey's Senior Vice-President of Sales, Marketing and Customer Relations, as well as Austin's step-son; Brown was President of the Starkey Foundation.  In the preceding month, Brown had been advised of the malware issue by Scott Nelson, the CFO.  Sawalich and Brown subsequently visited the IT department together, and Sawalich was annoyed that his identification badge did not provide them access to the Data Center.  He obtained admittance and instructed Duchscher to upgrade his badge for unlimited access.

5.    On the afternoon of September 8, Guggenberger was in a meeting with Sawalich, another Starkey executive, HR staff, and a consultant to finalize the arrangements for a leadership development event the following week.  Towards the end of the meeting, Guggenberger received a cellphone call from Julie Miller saying, "I've just been termed.  Now they're terming Jerry."  Miller was Ruzicka's executive assistant.  Stunned, Guggenberger

3

returned to his office for a 2 p.m. meeting.  When he reached the lobby, he saw Kristy Larson, Starkey's Director of Talent Management, in the company of an unknown security officer.

6.      Some time between 2 and 2:30 p.m., while Guggenberger was meeting with a direct report in his office, he saw Ruzicka being escorted to his office by two sheriff's deputies. A few minutes later, he saw Ruzicka escorted out of the building by the deputies. Guggenberger's meeting ended, and around 2:40, he received a telephone call from a staff assistant to Austin asking him to "come see Bill."  He reported to Austin's area as requested and was escorted to the Center for Excellence conference room.  He waited.  After approximately half an hour, another staffer entered and told him that Austin would see him in the Foundation Conference Room.  Guggenberger walked to that empty conference room, took a seat, and waited.  A cellphone was lying on the table.

7.      Austin and Sawalich entered the room and sat down.  Sawalich looked strained and nervous.  He sat down at the seat where the cellphone was placed.  He handled the cellphone and the papers he had brought with him, then set the phone back on the table.  He may have recorded the conversation.  Austin had some papers in front of him.  He asked Guggenberger, in his drawling voice, to tell him about a company called "Sound Art."  Guggenberger had never heard of it and asked him to repeat the name.  "Sound Art," Austin said.  Guggenberger repeated the name and asked who they were and what they did.  Austin said, "I thought you would have heard that name before."  Guggenberger said he had not.  Sawalich explained that it was "a start-up company selling directly to the consumer" and that Starkey employees were being solicited to "join."  They said there was a business plan including staffing projections.  Guggenberger asked if there was a COO position comparable to his position at Starkey.  Sawalich said there was not.

4

8.      They said that Ruzicka had sent the document about the start-up to Guggenberger and that Guggenberger had forwarded some emails from Ruzicka to his personal gmail account. Guggenberger acknowledged that he believed Ruzicka's contract was up in early 2016 and that Ruzicka had started to think about "what his next chapter was going to be."  Guggenberger thus conveyed his understanding that Ruzicka's communications referred only to post-Starkey business activity, not to any activity while Ruzicka was still employed by Starkey.

9.      Austin then asked if Guggenberger had a "loyalty agreement you did with Jerry," referring to the "long-term service and loyalty" provision in Guggenberger's Employment Contract.  Austin implied that the "loyalty" referenced in the agreement was to Ruzicka, who had signed the contract, when in actuality the bonus was for loyalty to Starkey for approximately 29 years at the time the contract was executed.  Guggenberger acknowledged there was an agreement.  Austin suggested, accusingly, that 5 years' compensation would be enough "to get a new start-up going."  Guggenberger, however, was not planning to go anywhere.  As noted, he had signed a new Employment Contract with Starkey and needed the security and benefits it provided for his family.  He had no intention of leaving his role at Starkey behind for a risky start-up when Ruzicka departed from Starkey, and he had made no commitment to Ruzicka.  He said to Austin and Sawalich that he had reported to Ruzicka for thirty years, "but if that reporting is changing to you, Bill, or you, Brandon, I'm fine with that.  At the end of the day I've worked for my family and the people at Starkey and do what I enjoy."  Austin and Sawalich turned and stared into each other's eyes for a long interval, as if debating silently whether to carry out their plan to terminate Guggenberger on the spot.  Sawalich finally broke the trance and made a gesture with folded fingers towards Austin.  Austin hemmed and hawed, then drawled to Guggenberger, "I suppose I can trust you for now."  Guggenberger said, "OK, then.  Let me

know if you need anything else and keep me posted." During Austin's meeting with Ruzicka earlier in the day, Ruzicka had advised Austin that he would be crazy to fire Guggenberger. That advice prevailed for the moment.

10.    Guggenberger returned to his building.  Larson met him with a startled, sickened expression and asked if he needed something else out of his office.  She had already delivered his backpack and keys to Austin's office area; she obviously thought he was being terminated and would be escorted from Austin's building.  Guggenberger told her he was going back to work. The security officer retrieved Guggenberger's backpack and keys.  Guggenberger remained at work until around 5 p.m.

11.    About 9 o'clock that night, Guggenberger received a text message from Sawalich instructing him not to report to Starkey the next day until after he had talked to Austin.  Sawalich said Austin would call Guggenberger in the morning.  Sawalich had no authority to instruct Guggenberger not to perform his duties at Starkey, but it was apparent that Sawalich was acting as Austin's mouthpiece, and Ruzicka had been terminated, snapping Starkey's chain of command.  In the morning, which was Wednesday, September 9, Richard Brown, President of the Starkey Foundation, called Guggenberger and advised that his employment with Starkey had been terminated.  Brown had no authority whatsoever in Starkey, but was serving as another mouthpiece for Austin, or for Austin and Sawalich.  A termination letter signed by Austin was delivered to Guggenberger's home by courier that same day.  A copy of the termination letter is attached hereto as Exhibit 2.

12.    The termination letter dated September 8, 2015 and signed by Austin alleged that Guggenberger had "conspired with Jerry Ruzicka and others to misuse the Company's ideas, developments, relationships, and other resources for your own benefit and attempted to divert

corporate resources and opportunities to develop a competitive corporation." It asserted that Starkey could therefore pursue him in the courts for breach of fiduciary duty, breach of the duty of loyalty, breach of contract, usurpation of corporate opportunities, conversion of corporate resources, misappropriation of trade secrets, theft of intellectual property, civil conspiracy, and unfair competition. This litany of baseless accusations was an attempt to intimidate Guggenberger into abandoning his legal rights, as was Austin's threatening statement further down that Starkey was "prepared to initiate aggressive legal action against you" if Guggenberger did not come to an agreement "to address the substantial harm you have inflicted on Starkey." Such unreal but grave accusations breached the duty of good faith and fair dealing. As published false statements touching Guggenberger's profession, they also constitute defamation per se.

13.   Guggenberger was not terminated for the non-existent offenses enumerated in Austin's fictitious termination letter, but to punish Ruzicka for defying Austin, and to punish Guggenberger for being a close colleague of Ruzicka's. Guggenberger never competed with Starkey, or solicited its customers, or misappropriated its information, or referred customers to competitors, or benefited himself at Starkey's expense, or interfered with Starkey's business relationships, or hindered Starkey's operations. On the contrary, Guggenberger furthered Starkey's operations to the summit of his abilities. At most, he spent a minimal amount of time reviewing and responding to Ruzicka's plans to start a new business after Ruzicka left Starkey. By purporting to terminate Guggenberger on a wholly inadequate and sham basis, without regard for the termination requirements of his Employment Contract with Starkey, Starkey (through Austin) breached the Employment Contract. By terminating him based on false and defamatory accusations and through devious and dishonest means, Starkey (through Austin and Sawalich) breached the implied covenant of good faith and fair dealing. By advising Guggenberger that he

had forfeited all benefits of his agreements with Starkey, Starkey (through Austin) advised that it was retaining all monies and property owed to Guggenberger, thus unjustly enriching Starkey, and that it was confiscating all monies and property in Starkey's possession already owned by Guggenberger, thus breaching its duties as sponsor to the Starkey ESOP.  By publishing false accusations internally at Starkey, Starkey (through Austin and, it is believed, Sawalich and Brown) defamed Guggenberger.  By failing to pay compensation and benefits due and owing to Guggenberger at the time of his termination, Starkey violated Minnesota wage law.

14.     On September 9, 2015, Austin announced the termination of Ruzicka, Nelson, Guggenberger, and Larry Miller on Starnet, the Starkey intranet.  The announcement stated, "We cannot disclose additional information due to the ongoing investigation."  Austin also made a statement to the press, in which he said, "We can't comment due to an ongoing investigation." Those statements implied that the investigation had proceeded far enough to uncover misconduct or even criminal activity so dire that the officers, including Guggenberger, had to be terminated and removed from the company even before the investigation was concluded.

### B.     Starkey's Post-Termination Defamation of Guggenberger.

15.     On December 21, 2015, on behalf of Starkey, Austin and Sawalich addressed numerous Starkey employees in "town hall" meetings at the company headquarters.  Sawalich stated that Starkey was not being investigated and that Starkey was a victim of crimes.  Because Starkey employees had been informed that Guggenberger was terminated together with other officers in connection with an investigation, the Starkey employees would have understood Sawalich's statements to mean that Guggenberger was involved in criminal activity.  Sawalich's statements were false and defamatory.  Because Sawalich's statements touch Guggenberger in his profession and involve allegations of criminal activity, they constitute defamation per se.

Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

16.     Austin also addressed Starkey's "town hall" meetings on December 21, 2015. Austin stated that millions and millions of dollars had been stolen from the company; that Starkey's values were taken and misrepresented; that power had been abused; and that people had been put in positions of responsibility that were beyond their capacity to fulfill.  Because Starkey employees had been informed that Guggenberger was terminated together with other officers in connection with an investigation, the Starkey employees would have understood Austin's statements to mean that Guggenberger was involved in stealing millions of dollars from Starkey; that Guggenberger had seriously compromised Starkey's values; that Guggenberger had abused his power in the company; and that Guggenberger was not capable of fulfilling the responsibilities of the position he had in Starkey.  Austin's statements were false and defamatory. Because Austin's statements touch Guggenberger in his profession and involve allegations of criminal activity, they constitute defamation per se.

17.     On February 3, 2016, on behalf of Starkey, Austin addressed Starkey employees in "town hall" meetings to rebut the allegations in Ruzicka's complaint, which was filed on January 14, 2016.  On behalf of Starkey, Austin stated that money was stolen and people are going to jail; that each person involved lied to his face after stealing the money; that the company survived insult and injury; that the company had a cancer that would have killed it in another three or four months; that the company had survived by cutting out the cancer.  Because Starkey employees had been informed that Guggenberger was terminated together with other officers in connection with investigations by law enforcement and by the company, the Starkey employees would have understood Austin's statements to mean that Guggenberger was involved in stealing from Starkey; that Guggenberger had committed criminal offenses and was going to jail; that Guggenberger had lied to Austin's face after stealing from Starkey; that Guggenberger

was involved in insulting and injuring Starkey; that Guggenberger was part of a cancer that

would have killed the company in another three or four months; and that Guggenberger was part

of a cancer that the company survived by cutting it out, i.e., by terminating Guggenberger and

others.  Austin's statements were false and defamatory.  Because Austin's statements touch

Guggenberger in his profession and involve allegations of criminal activity, they constitute

defamation per se.

### C.    *Guggenberger's Employment Contract and Contract Damages.*

18.    Guggenberger's Employment Contract with Starkey, dated December 1, 2014

(attached as Exhibit 1 hereto), provides that it shall not be terminated before Guggenberger's

65th birthday "except for an important reason as stated in III-2."  An "important reason" is

defined as either "(a) failure by Guggenberger to substantially perform duties for a period of 120

days following written notice by Starkey of such failure" or "(b) other unforeseen events or

occurrences creating a material economic hardship on Starkey."  Those conditions were not

present when Guggenberger was terminated.  Up to the time of his termination, Guggenberger

had been performing his duties with the total dedication he had shown for 29-plus years.  Nor

had Guggenberger engaged in any conduct whatsoever that inflicted "a material economic

hardship on Starkey."  On the contrary, he contributed mightily to its successful operation

throughout his career.

19.    Guggenberger's annual salary at the commencement of the Employment Contract

was $370,999.93, with a guaranteed 5% annual raise and a guaranteed minimum of 8 weeks'

salary each year at his then-current rate.  On April 18, 2015, he received the required raise

pursuant to his performance review.  As one item of contract damages, Guggenberger is

therefore owed the liquidated amount of $7,865,559 for salary and minimum bonuses remaining

to be paid under the Employment Contract.  He is owed unliquidated amounts for additional performance bonuses to which he is entitled based on Starkey's annual revenue growth at the rate of 1 week's salary per 1% of annual revenue growth and for unreimbursed business expenses.

20.     Upon termination for any reason, "including voluntary and involuntary termination," Guggenberger is entitled to "a long-term service and loyalty bonus" based on his long-term service and loyalty to Starkey.  It consists of 20% of Guggenberger's salary at the time of termination multiplied by the number of years served at the time of termination.  At the time of his termination, Guggenberger had worked at Starkey since January 18, 1986, i.e., for 29 years and 234 days.  As a second item of contract damages, Starkey owes Guggenberger the liquidated amount of $2,309,337.

21.     Starkey promised to provide medical insurance to Guggenberger and his family following termination of Guggenberger's employment until Guggenberger's 65th birthday.  The insurance provided after termination must be "comparable" to "the executive family health plan" in force at Starkey as of December 1, 2014.  The total premium on Guggenberger's family health plan at the time of his termination was approximately $16,800 annually.  It will inevitably increase.  As a third item of contract damages, Guggenberger is entitled to an unliquidated amount equal to the cost to Guggenberger of comparable family health insurance through his 65th birthday.

22.     Starkey agreed to fund Guggenberger's life insurance policy with Lincoln National Life Insurance Company in its entirety, including the premium and a gross-up of the premium payment sufficient to pay income taxes on the premium amount.  Starkey made the first of two equal installments in December 2014 and was to make the second in 2015.  The first

installment was in the amount of $800,000, consisting of $393,000 premium paid to Lincoln and $407,000 paid to Guggenberger to cover income taxes. As a fourth item of contract damages, Starkey owes Guggenberger the liquidated amount of $800,000.

23.     Guggenberger is a participant in the Starkey ESOP that Austin dislikes. Starkey is the plan sponsor. As of December 31, 2014, Guggenberger's total account balance was $183,944.85. Austin has threatened to drive the value of the stock in the ESOP to one dollar. Terminating Ruzicka, Nelson, Guggenberger, Longtain, and Miller was a step along that path. Austin advised Guggenberger in the termination letter that he would receive "no further compensation or benefits from Starkey whatsoever." In addition to his claims for damages set forth herein, Guggenberger seeks relief pursuant to 29 U.S.C. § 1132(a)(1)(B) from Starkey's purported deprivation of all of Guggenberger's rights in the Starkey ESOP.

## FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT

24.     The allegations in paragraphs 1 through 23 above are incorporated by reference herein as if each allegation were fully restated and realleged.

25.     Guggenberger complied with his obligations under the Employment Contract and his other agreements with Starkey. As alleged above, Starkey breached the Employment Contract by terminating Guggenberger's employment contrary to the terms of the Employment Contract and purporting to deprive him of all rights and benefits under the Employment Contract and other agreements with Starkey. Starkey's breach of the Employment Contract has caused damage to Guggenberger in the following liquidated amounts: $7,865,559 in salary and minimum bonus and $2,309,337 as a long-term service and loyalty bonus.

12

26.     Starkey's breach of the Employment Contract has also caused damage in unliquidated amounts for additional performance bonuses based on Starkey's increases in annual revenue and payment of family medical insurance until Guggenberger's 65th birthday.

27.     Starkey agreed to fund Guggenberger's life insurance policy by paying Guggenberger the amount of the premium grossed-up to cover additional income taxes.  Starkey breached that agreement by failing to make the second agreed payment of $800,000.  Starkey therefore owes Guggenberger the liquidated amount of $800,000.

28.     Starkey owes Guggenberger unliquidated amounts for unreimbursed business expenses at the time of his termination.

29.     Wherefore, Guggenberger seeks damages from Starkey for breach of contract in a liquidated amount of $10,974,897 and unliquidated amounts greater than $50,000 to be determined at trial.

## SECOND CAUSE OF ACTION:
## BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

30.     The allegations in paragraphs 1 through 29 above are incorporated by reference herein as if each allegation were fully restated and realleged.

31.     A covenant of good faith and fair dealing is implied in the Employment Contract and Guggenberger's other agreements with Starkey, specifically the agreement to fund Guggenberger's life insurance policy.  By its conduct alleged above, Starkey breached the implied covenant in the Employment Contract and other agreements, taking actions through Austin, Sawalich, and other employees and agents of Starkey intended to prevent Guggenberger from receiving the benefits of the Employment Contract and such other agreements.  Starkey's

27-CV-15-17093

CASE 0:16-cv-02021-JRT-LIB   Document 1-1   Filed 06/20/16   Page 14 of 26   Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

breaches of the implied covenant caused damage to Guggenberger in the amounts set forth above.

32.    Wherefore, Guggenberger seeks damages from Starkey for breach of the implied covenant in a liquidated amount of $10,974,897 and unliquidated amounts greater than $50,000 to be determined at trial.

## THIRD CAUSE OF ACTION:
## DEFAMATION

33.    The allegations in paragraphs 1 through 32 above are incorporated by reference herein as if each allegation were fully restated and realleged.

34.    The statements made on Starkey's behalf by Austin and/or Sawalich and others in the termination letter, which were published to the persons involved in preparing, sending, and filing the termination letter, and the additional statements made by Austin and/or Sawalich to the Starkey workforce on December 21, 2015 and on February 3, 2016, were published and were false and defamatory either expressly or by implication.  Guggenberger will also seek damages for any compelled self-publication of Starkey's defamatory statements.

35.    As the natural result of the statements made on Starkey's behalf by Austin and/or Sawalich and others in the termination letter, Starkey terminated Guggenberger and caused him to suffer special damages in a liquidated amount of $10,974,897 and unliquidated amounts greater than $50,000 through loss of his salary and raises and the other contractual benefits described above, including the loss of his minimum bonuses; his additional annual performance bonuses; his long-term service and loyalty bonus; his family health insurance premiums; the outstanding premiums (with salary gross-up) on his life insurance policy; and unreimbursed business expenses.

14

36.     Wherefore, Guggenberger seeks general damages and special damages from Starkey for defamation in an amount greater than $50,000 to be determined at trial.

## FOURTH CAUSE OF ACTION:
## UNPAID WAGES

37.     The allegations in paragraphs 1 through 36 above are incorporated by reference herein as if each allegation were fully restated and realleged.

38.     Pursuant to his Employment Contract, Guggenberger is owed the first installment of his long-term service bonus in the amount of $461,867; unpaid salary; and unreimbursed business expenses.  Pursuant to Starkey's agreement to fund his Lincoln National life insurance policy on a grossed-up basis, Guggenberger is owed $800,000.  Guggenberger demanded in writing that Starkey pay the amounts owed, but the amounts owed were not paid to Guggenberger by Starkey within 24 hours as required by Minn. Stat. § 181.13.

39.     Wherefore, pursuant to Minn. Stat. § 181.13, Guggenberger seeks unpaid wages from Starkey in the liquidated amount of $1,261,867 and unliquidated amounts to be determined at trial; the penalty based on those amounts resulting from their non-payment for 15 days following demand; and attorneys' fees and costs of litigation pursuant to Minn. Stat. § 181.171.

## FIFTH CAUSE OF ACTION:
## UNJUST ENRICHMENT/QUANTUM MERUIT

40.     The allegations in paragraphs 1 through 39 above are incorporated by reference herein as if each allegation were fully restated and realleged.

41.     Starkey's advisement (through Austin) that Guggenberger had forfeited all benefits under his agreements with Starkey was wrongful and inequitable and will result in unjust enrichment if Starkey is permitted to retain any monies owed to Guggenberger or required to be paid on his behalf.  Guggenberger has earned the compensation described herein by his

27-CV-15-17093

CASE 0:16-cv-02021-JRT-LIB    Document 1-1    Filed 06/20/16    Page 16 of 26    Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

diligent work on behalf of Starkey for 29 years and his major contributions to Starkey's success during and beyond that period.

42.    Wherefore, Guggenberger seeks damages from Starkey for unjust enrichment and/or quantum meruit in a liquidated amount of $10,974,897 and unliquidated amounts greater than $50,000 to be determined at trial.

## SIXTH CAUSE OF ACTION:
## RELIEF UNDER 29 U.S.C. § 1132(a)(1)(B)

43.    The allegations in paragraphs 1 through 42 above are incorporated by reference herein as if each allegation were fully restated and realleged.

44.    Starkey is the plan sponsor for the Starkey ESOP, in which Guggenberger is a participant.  Starkey's advisement (through Austin, a trustee of the Starkey ESOP) that Guggenberger had forfeited all benefits under his agreements with Starkey and would receive no further compensation or benefits whatsoever purported to strip Guggenberger of any rights in his ESOP account.  Starkey threatened to drive the share price to one dollar and terminated senior executives who were critical to Starkey's success and increase in share value.

45.    Wherefore, Guggenberger seeks appropriate relief under 29 U.S.C. § 1132(a)(1)(B) to enforce his rights in the Starkey ESOP, as well as attorneys' fees and costs of litigation.

## REQUEST FOR JURY TRIAL

46.    Guggenberger requests that his claims in this matter, with the exception of his Sixth Cause of Action for relief under 29 U.S.C. § 1132(a)(1)(B), be tried before a jury pursuant to Minn. R. Civ. P. 38.01.

## PRAYER

WHEREFORE, Plaintiff Keith A. Guggenberger requests the following relief:

1.      Judgment in favor of Plaintiff and against Defendant, for liquidated damages in the amount of $10,974,897; unliquidated damages in an amount greater than $50,000, to be determined at trial; a penalty pursuant to Minn. Stat. § 181.13; and appropriate relief under 29 U.S.C. § 1132(a)(1(B);

2.      An award of attorneys' fees and costs of litigation pursuant to Minn. Stat. § 181.71, 29 U.S.C. § 1132(g), and other applicable law;

3.      Prejudgment interest in accordance with Minn. Stat. § 549.09 and other applicable law; and

4.      Such other and further relief as the Court shall find just and equitable.

Dated:  March 24, 2016                          BRIOL & ASSOCIATES, PLLC


                                                 */s/ Mark J. Briol*
                                                Mark J. Briol (#126731)
                                                William G. Carpenter (#274598)
                                                3700 IDS Center
                                                80 South Eighth Street
                                                Minneapolis, MN  55417
                                                Telephone:  (612) 756-7777
                                                Facsimile:  (612) 337-5151

                                                ATTORNEYS FOR KEITH A.
                                                GUGGENBERGER

### ACKNOWLEDGEMENT

Plaintiff Keith A. Guggenberger acknowledges through his attorneys that he is subject to sanctions under Minn. Stat. § 549.211 if this pleading is presented in violation of that section.


Dated:  March 24, 2016                          */s/ Mark J. Briol*
                                                        Mark J. Briol

Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

# EXHIBIT 1

# EMPLOYMENT CONTRACT

Between:    Starkey Hearing Technologies, Inc.
            6700 Washington Ave South
            Eden Prairie, Minnesota 55344 U.S.A.

hereafter known as Starkey

and:        Keith Guggenberger

hereafter known as Guggenberger

Whereas Starkey Hearing Technologies, Inc. (Starkey) wishes to employ Guggenberger and Guggenberger wishes employment by Starkey, it is in Starkey's and Guggenberger's mutual desire to set forth all terms of Guggenberger's employment therefore the parties agree to the following:

## I.   Areas of Responsibility, Authorization

(1)   Starkey agrees to employ Guggenberger as the Senior Vice President of Operations. Guggenberger is obliged to conduct the work of the Company and its operations as directed by the President. He is directly responsible to the President.

## II.   Duties and Responsibilities

(1)   The Senior Vice President of Operations shall execute his responsibilities with the diligence of a conscientious businessperson and obey the obligations imposed upon him by the law, Articles of Association and Shareholders' Resolution or by other directives of the President.

(2)   The Senior Vice President of Operations shall comply with the rights and duties of the employer in the context of the regulations with respect to Employment, Statutory, and Social Laws.

(3)   Starkey is entitled to demand at any time, a report on the condition of the Company and to demand reports on specific business issues.

(4)   The Senior Vice President of Operations shall place his entire working capacity, experience and knowledge at the disposal of the Company; he shall provide the necessary business overtime.

**Exhibit 1**

### III.   Beginning and Termination of the Contract

(1)   The contract shall commence on December 1, 2014 and shall not be terminated before Guggenberger's 65th birthday unless for an important reason as stated in III-(2).

(2)   Given an important reason, the employment contract may be terminated without prior notice with immediate effect. An important reason in particular is:

(a)   failure by Guggenberger to substantially perform duties for a period of 120 days following written notice by Starkey of such failure;

(b)   other unforeseen events or occurrences creating a material economic hardship on Starkey.

(3)   Notice of termination must be given in writing. The Company may give notice through an organ which has been granted valid authorization. The Senior Vice President of Operations shall submit his notice of termination to the President. The date of receipt of the termination notice is relevant in determining the period of notice.

### IV.   Compensation

(1)   The base salary of the Senior Vice President of Operations at signing shall total $370,999.93 (in words) Three hundred seventy thousand, nine hundred ninety-nine and ninety three cents.

Guggenberger's salary will be reviewed approximately every 12 months. He will be entitled to an annual upward salary adjustment of at least 5%.

(2)   The yearly performance bonus will be determined at the discretion of Starkey; however, Guggenberger will receive a minimum bonus of 8 weeks of Guggenberger's then current base salary. In addition to the minimum bonus, Guggenberger shall receive:

(i)   an additional bonus of 1.0 weeks for each percentage of annual consolidated revenue growth of Starkey over the annual revenue of Starkey for the previous year, and

(ii)   additional weeks based on the following criteria:

| a. Gross Margin | Additional Weeks Earned |
|---|---|
| >=55% | 2 |
| >=57% | 2 |
| >=60% | 2 |

*Note: These are cumulative weeks of earned bonus $*

2

For illustrative purposes only, say Starkey's annual revenue growth over the previous year is 3.7% and Gross Margin for that year was 56.8%, Guggenberger shall receive a bonus equal to 13.7 weeks of his then current base salary (calculated as 8 weeks minimum + 3.7 weeks for the annual revenue growth + 2 weeks for Gross Margin achieved). All bonuses shall be earned on the last day of Starkey's fiscal year end, determined by year-end financial closing and paid within the first fiscal quarter.

(3)     Compensation for necessary business overtime is included in the aforesaid salary.

(4)     The Senior Vice President of Operations shall be reimbursed for expenses (travel and representation expenses, etc.) upon presentation of the receipt in accordance with the specific terms set out by the Company. The receipts must be submitted within one quarter of the conclusion of the trip or function.

## V.   Incapacitation, Disability and Death

(1)     In the event of sickness or other hindrance that is not the fault of the Senior Vice President of Operations, the salary shall continue to be paid for 90 days as of the end of the calendar month in which the hindrance begins. If the Senior Vice President of Operations receives sick pay or similar compensation from third parties, the Company shall only pay the difference between the other compensation and the Senior Vice President of Operations most recent salary during the 90 day period whether or not subsequent compensation payments are made shall be based on the judgment of the Company.

(2)     During Guggenberger's employment term, the Company shall cover premiums for a supplemental disability insurance plan that provides Guggenberger monthly income following a disability equal to at least 60% of Guggenberger's base salary. That disability plan shall cover Guggenberger through his social security normal retirement age or the maximum benefit period provided (whichever is later).

(3)     In the event of death of the Senior Vice President of Operations, his Beneficiary(s) shall receive his salary for 90 days as of the end of the month in which the death occurs.

3

## VI.   Health Insurance

Guggenberger will be entitled to health insurance equal to the executive family health plan in place as of the signing of this contract for the duration of the contract. Upon termination of employment, as defined in Section VIII, Starkey shall provide a comparable insurance plan at no cost to Guggenberger until Guggenberger reaches the age of 65 years.

## VII.   Accident, Life Insurance

The Company shall bear the costs of insurance for the Senior Vice President of Operations against business related accidents in particular on trips, in the event of death, bodily harm and disability and other damages (doctor's fees, prescriptions and hospital costs, material damage, loss of salary, etc.). The insurance claims shall accrue directly to the Senior Vice President of Operations or his heirs.

The Company shall bear the costs of group life insurance for Guggenberger who is defined within the class of Vice Presidents.

## VIII.   Loyalty Agreement

Guggenberger is entitled to a long-term services and loyalty bonus. The Company has agreed to a loyalty bonus equal to 20% of Guggenberger's then current base salary at the time of termination or retirement for every year of service at the time of termination or retirement. For purposes of this section, "termination" shall mean any and all events causing separation of employment including voluntary and involuntary termination, death or long term disability. Payments shall be made in annual installments over 5 years, or, if requested by Guggenberger or his estate, over 10 years. Upon Guggenberger's death, all payments due that remain outstanding shall be paid to Guggenberger's estate.

Example: If Guggenberger terminates employment upon completion of his 28th year and say Guggenberger's base salary is $350,000, his payments will be as follows:

$70,000 (Salary x 20%) x 28 (years) = $1,960,000

| | |
|---|---|
| 1st payment upon termination: | $392,000 |
| 2nd payment on 1st anniversary of termination: | $392,000 |
| 3rd payment on 2nd anniversary of termination: | $392,000 |
| 4th payment on 3rd anniversary of termination: | $392,000 |
| 5th payment on 4th anniversary of termination: | $392,000 |

4

27-CV-15-17093

CASE 0:16-cv-02021-JRT-LIB   Document 1-1   Filed 06/20/16   Page 23 of 26   Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

## IX.   Survival, Successors

This Contract shall survive a change in management or ownership of Starkey and all provisions shall be binding on any successors or assigns.  In addition, if Starkey sells or disposes of all or substantially all of its assets, or sells or transfers a majority of the shares, or if Starkey is merged or consolidated with or into another company ("Change in Control") resulting in either the termination of Guggenberger's employment prior to the control Effective Date, or an adverse and material change to his duties and responsibilities after, then he shall receive the Severance Compensation specified in Section VIII, an amount equal to the cost for a COBRA continuation program, accrued but unpaid PTO, unpaid expense reimbursement, and other accrued benefits pursuant to Starkey's 401K plan, ESOP and similar benefits in existence at the time of termination.

## X.   Final Clause

(1)   Should any provision or provisions of this contract be held invalid or illegal, such determination shall not affect the validity of the remaining provisions of the contract.  If such occurs, the parties shall undertake to replace, amend or convert the invalid provision or provisions with a valid provision or provisions having, if possible, the same economic effect intended by the parties.

(2)   Additional oral agreements were not concluded.

(3)   Suspensions, amendments or supplements to this contract must be in writing.

Date   12/1/14                          Date   12/1/14

For STARKEY
Starkey Hearing Technologies Inc.

Jerome C. Ruzicka                          Keith Guggenberger
President

5

Filed in Fourth Judicial District Court
3/24/2016 12:05:51 PM
Hennepin County, MN

# EXHIBIT 2



6700 Washington Avenue S.
Eden Prairie, Minnesota 55344
T: 1.800.328.8602

www.starkey.com

September 8, 2015

Keith Guggenberger
4851 Westminister Rd.
Minnetonka, MN 55345

Your employment with Starkey is terminated effective immediately. We have evidence that you have engaged in serious misconduct in violation of your fiduciary and legal obligations to the Company. That includes information that you have conspired with Jerry Ruzicka and others to misuse the Company's employees, ideas, developments, relationships, and other resources for your own benefit and attempted to divert corporate resources and opportunities to develop a competitive corporation.

The list of legal claims that Starkey could assert against you is long. It includes, but is not limited to, the following: (i) breach of fiduciary duty; (ii) breach of the duty of loyalty; (iii) breach of contract; (iv) usurpation of corporate opportunities; (v) conversion of corporate resources; (vi) misappropriation of trade secrets; (vii) theft of intellectual property; (viii) civil conspiracy; and (ix) unfair competition.

Given the circumstances, the following consequences are effective immediately:

- Your employment with Starkey and all existing agreements with the Company are terminated immediately.
- You have forfeited all rights under your existing agreements with Starkey, and you will receive no further compensation or benefits from Starkey whatsoever.
- You are required to return all company property, documents, computers, and digital files to Starkey immediately.
- You must immediately cease and desist from misusing Starkey's resources, interfering with the Company's employment and business relationships, and soliciting our employees.
- You are under an ongoing duty to preserve any and all physical or digital evidence relating to your efforts to divert corporate resources, solicit employees, and develop a competitive business. This evidence must be preserved for discovery should litigation result.

**Exhibit 2**



**Starkey**
Hearing **Technologies**

6700 Washington Avenue S.
Eden Prairie, Minnesota 55344
T: 1.800.328.8602

www.starkey.com

We will continue to investigate your wrongdoing and we reserve all rights to seek whatever legal remedies are appropriate, including but not limited to any and all appropriate claims.

Over the course of the coming days, it is our intent to negotiate a mutually amicable resolution of this matter with you. In the event that we cannot reach an agreement to address the substantial harm that you have inflicted on Starkey, however, the Company is prepared to initiate aggressive legal action against you. If necessary, we will seek declaratory and injunctive relief, compensatory and punitive damages, forfeiture of compensation previously paid to you, disgorgement of any illegally obtained profits, as well as attorneys' fees and expenses.

I regret that your conduct has left us no choice but to take this action. Nevertheless, I am cautiously optimistic that we will be able to resolve this matter. Please let us know when you are ready to discuss a potential resolution.

Sincerely,

William F. Austin